## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **Criminal No. 05-0210 (RMU)** |
| **AISSATOU PITA BARRY** | : | |
| **Defendant** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

I.    **INTRODUCTION**

The **Pre-Sentence Investigation Report** herein suggests that Defendant be assessed a total Offense Level of 26 and Criminal History Category I with a recommended Guideline Sentencing Range of 46 to 57 months. Defendant disputes the Total Offense Level calculation and claims she is entitled to the benefit of the "**Safe Harbor**" of U.S.S.G. 2S1.3(b)(3) to reduce her base offense level to 6. Alternatively, Defendant is entitled to a downward departure pursuant to the District of Columbia Circuit's ruling in United States v. Smith, 27 F.3rd 649 (D.C. Cir., 1994). Finally, Defendant also argues that a sentence within the Guideline Range recommended by the **Pre-Sentence Investigation Report** would not be reasonable when the "**Factors to be Considered in Imposing a Sentence**" set forth in 18 U.S.C. §3553(a) are considered.

This Memorandum will address these issues and set forth Defendant's argument as to the forfeitures sought by the Government.

1

II.   **STATEMENT OF FACTS AND CASE**

On September 12, 2005, Defendant pleaded guilty to a single count Information

charging her with *Operating an Unlicensed Money Transmitter Business* in violation

of 18 U.S.C. §1960. Although there was no Plea Agreement, the parties did stipulate to

a *Factual Proffer in Support of Guilty Plea* repeated verbatim below[1]:

> On August 16, 1999, defendant incorporated Guinex
> International, Inc., (hereinafter "Guinex") in the District of
> Columbia with the stated purpose of transmitting money
> from the United States for delivery to various parts of the
> world. Defendant is the President and sole owner of Guinex.
> From August 1999 to November 2004, Guinex maintained an
> office at 6856 Eastern Avenue, N.W., Washington, D.C.
> Defendant has played an active role in the day-to-day
> operation of the business since its inception. In addition,
> as of November 2004, defendant employed two others to
> assist in the operation of the business.
>
> Since its inception, Guinex has conducted transactions
> on behalf of approximately 5000 customers. Between
> October 26, 2001, and November 15, 2004, Guinex conducted
> over 65,000 transactions for its customers. During this
> time period, Guinex in turn transferred over $15,500,000,
> via wires to various international locations, including Guinea,
> Gambia,Senegal, Sierra Leone, Hong Kong, Singapore, China,
> the United Arab Emirates, Turkey, India, England and France,
> for further distribution to individuals who had been designated
> by Guinex's customers in the United States. Guinex generally
> charged a fee for its services of 10% of the total amount of money
> transferred. Defendant and other Guinex employees also provided
> customers with the numbers of various bank accounts controlled
> by defendant and Guinex instructed customers that they could
> make deposits directly into those accounts. Defendant and
> other Guinex employees did not ask customers to provide
> any information about the source of the monies they were
> transmitting.

---

[1] In defense counsel's acknowledgment and acceptance of this factual proffer, Defendant "reserve[d] the
right to present additional facts at sentencing in support of any sentencing and forfeiture issues."
Defendant will present additional factual support of her sentencing arguments in the body of this
Memorandum in the form of documents, affidavits and proffers of testimony as to which witnesses may, if
necessary, be called to testify at sentencing.

As of July 18, 2000, District of Columbia law provided that "no person shall engage in the business of money transmission without a license." 26 D.C. Code §1002(a). Violators of this provision are subject to a criminal penalty of up to five years imprisonment, a fine of up to $25,000, or both. 26 D.C. Code §1023(c). Neither defendant nor Guinex obtained a license to operate a money transmission business in the District of Columbia at any time between October 26, 2001, and November 15, 2004.

On June 6, 2003, defendant submitted an application for a money transmitter license with the D.C. Department of Banking and Financial Institutions, which application included, among other items, a $500 application fee a $50,000 security bond. However, defendant never received the license, and defendant continued to operate her money transmitting business without a license until her arrest on November 15, 2004.

Under federal law, "[a]ny person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury...." 31 U.S.C. §5330(a). Defendant did not register Guinex with the Secretary of the Treasury at any time between October 26, 2001, and November 15, 2004.

In an interview conducted on November 15, 2004, defendant admitted that she has operated a money transmitting business in the District of Columbia since 1999. Defendant also stated that she had applied for a money transmitter license in the District of Columbia, but did not receive the license. Defendant stated that when she last called to check on the status of her application, she was told that the Licensing Board had lost her application and that she would have to submit another one. Defendant said that no one from the Licensing Board told her that she could operate her business without the license. Defendant also said that no one from the Licensing Board told her to stop operating her business until she received the license. Defendant stated that she did not know she needed a federal license and never applied for one.

Defendant stated that most, though not all, of her customers are people she sees in the community. Defendant obtains phone numbers and addresses from her customers,

3

but she does not ask them to provide any form of identification. Defendant stated that she was not familiar with the various forms used to report currency transactions or suspicious activity.

Defendant acknowledges that the following property is property involved in, or is traceable to property involved in, her operation of Guinex International, Inc., as an unlicensed money transmitting business:

a.  $26,554.00 in U.S. currency seized, on November 15, 2004, from the office of Guinex International, located at 6856 Eastern Avenue, #209, N.W., Washington, D.C.;

b.  $10,016.00 in funds seized, on November 22, 2004, from Suntrust Bank account #1000013521207, held in the name of Guinex International;

c.  $109,648.00 in funds seized, on November 23, 2004, from Chevy Chase Bank account #94376751, held in the name of Guinex International;

d.  $220 in funds seized, on November 23, 2004, from Suntrust Bank account #1000013521207, held in the name of Guinex International;

e.  $11,036.00 in funds seized, on November 27, 2004 from Bank One account #631150992, Held in the name of Guinex International;

f.  $66,153.00 in funds seized, on December 1, 2004, from Chevy Chase Bank account #007-2124369; and

g.  $50,000.00 in funds seized on May 18, 2005, from Great American Insurance Company, 580 Walnut Street, Cincinnati, Ohio 45202, held as security for bond number, 5448945, effective April 29, 2003, in the name of Guinex International, Inc.

4

By Memorandum Order dated December 15, 2005, this Honorable Court ruled that the Defendant bore the burden of proof to establish the Sentencing Guideline reductions she claims under U.S.S.G. §2S1.3[2].

## III.    ARGUMENT

### A.    Defendant Is Entitled To The Application Of The *Safe Harbor* Provision of U.S.S.G. §2S1.3 And The Concomitant Reduction In Her Base Offense Level To Six.

U.S.S.G. 2S1.3 significantly reduces the base offense level of a person convicted under 18 U.S.C. §1960. In order to receive this reduction, the Court must find the following:

1.    That §2S1.3(a)(2) and (b)(1) and (b)(2) do not apply[3];

2.    The Defendant did not act with reckless disregard of the source of the funds;

3.    The funds were the proceeds of lawful activity;

4.    The funds were to be used for a lawful purpose.

As set forth in the stipulated ***Factual Proffer in Support of Guilty Plea***, "most, though not all, of [Defendant's] customers are people she sees in the community." Defendant, in fact, maintained a computerized database, custom made for her business, which, in addition to transactional records, contained the phone numbers and addresses of her customers. It is this huge database of information which forms the

---

[2] Defendant will proceed to attempt to satisfy that burden of proof but respectfully reserves the argument that the burden should be on the Government as matter of both Constitutional law and non-constitutional sentencing law for the reasons more thoroughly set forth in ***Defendant's Memorandum Regarding Burden of Proof at Sentencing and Defendant's Response to Newly Raised Issues contained in Government's Reply to Defendant's Memorandum Regarding Burden of Proof at Sentencing.***

[3] In its ***Memorandum Regarding Burden of Proof at Sentencing***, the Government conceded this element. See page 3 therein.

basis for much of the Government's evidence against the Defendant as to the nature and scope of her business.   When printed out in its basic format, counsel estimates that over 500 pages were printed out.[4]  The Government was able to derive substantial additional information from the database, loading the data into a computer and extracting data in different formulas to serve its prosecutorial needs.  The Government's ability to mine this data contradicts its claim that Defendant acted with reckless disregard of the source of the funds she was transmitting.  The data may not have been perfectly complete in the eyes of the case agents, but surely Defendant did not recklessly disregard the information gathering requirement.

Defendant's long time employee, Muriel Tshita, has provided an Affidavit further describing the business activity and the practices and procedures of Guinex International.  **See Tab 1** - Copy of Affidavit of Muriel Tshita.  Ms. Tshita has worked for Guinex since 2001.  She has sworn that approximately 60% of Guinex customers were individuals known from the neighborhood or her church.  In paragraphs 5 and 6 of her Affidavit, she described the office procedures for information gathering.  The majority of transfers were small in size, money being transmitted back to family members for their support in Guinea.  Although some larger transactions were processed, the average transaction, calculated by dividing the total stipulated dollars involved ($15,500.000) by the stipulated number of transactions (65,000), was approximately $238.00 per transaction.

The Government makes much of the Defendant's admittedly poor business practice of allowing customers to deposit cash directly into the Guinex bank accounts

---

4 The Court will be able to review the printed out version of the database, or the digital copy which is

for subsequent transmission. The main purpose of this practice was security. Defendant and her employees were fearful of robberies and wanted to avoid storing and/or transporting cash deposits. Thus, they permitted cash to be deposited directly into the company's accounts. The customer would then fax over the deposit slip with written instructions for the transmission of the money. The fax record of these transactions were retained and the information entered into the database. The Government seized numerous deposit slips of this nature from Guinex's office during its investigation.

As for the third and fourth elements, Defendant adamantly denies having any actual or even remotely suspicious knowledge that money she had received in her business was the proceeds of unlawful activity. She also believed at all times that the funds she transmitted were to be used for lawful purposes. Moreover, none of the discovery provided by the Government even remotely suggests any illegal source of funds nor that the funds transmitted were to be used abroad for unlawful purposes.

Defendant ran a simple "Mom and Pop" style operation. Most of her customers were friends from the community who would come in because they saw the Defendant in the neighborhood or at church and trusted her. When Defendant was working the office, she would often catch up with the personal lives of these customers, and they would talk about their families here in the United States and abroad. Many would proudly show pictures of homes being constructed in Guinea with the funds being transmitted. Defendant's correspondent in Guinea cleared the transmissions much more quickly than other transmitters because of Defendant's honesty, reputation and

available on a cd-rom.

her prompt transmission of funds as promised. In turn, Guinex's customers were very happy with her service and in the last year of its existence, the business grew significantly. This was no criminal operation. It was simply an unlicensed operation.

Here again, in her essentially incompetent manner and without the benefit of proper professional help, it is stipulated that Defendant actually tried to obtain her money transmitter license from the District of Columbia Government, again belying any intent to operate some sort of surreptitious criminal enterprise. The Discovery in this case includes Guinex's 6 page Money Transmitter license application to the District of Columbia Department Banking and Financial Institutions and the numerous attachments thereto (Bates pages 43-77 of the Discovery provided by the Government). **See Tab 2**. The completed application was filed along with a $1235.00 application fee, the receipt for which Defendant provided to the Government. **See Tab 3** - copy of Receipt for Application Fee. The attachments include a wide variety of information about Guinex International such as personal information disclosures, the corporate Articles of Incorporation and various tax forms. A $50,000.00 Surety Bond was posted and subsequently seized by the Government, and is item (g) of the property list included in the Stipulated Facts. Page 59 of the Discovery shows that the District of Columbia Department of Banking and Financial Institutions had communications with the California Insurance Center, the insurance broker for the bond, requesting that the dates on the bond be changed to conform to some requirement of the Department. Counsel's research revealed that pursuant to D.C. Code §26-1009(b), the Defendant should have been issued her money transmitter license and since she had submitted a

8

completed application which was simply not acted upon within the time required by the statutory scheme. The Defendant also properly obtained an occupancy license for her business, on file with the District of Columbia Department of Consumer and Regulatory Affairs which described the purpose of the occupancy as "money transmission to African office..." **See Tab 2** -Bates page 77. The Defendant was hiding nothing from the Government, further demonstrating her lack of intent to violate any substantive law.

**B.    Defendant Is Entitled To A Downward Departure Pursuant To The D.C. Circuit's Ruling In United States v. Smith, 27 F.3d 649 (D.C. Cir., 1994).**

As noted in Part E of the **Pre-Sentence Investigation - *Factors That May Warrant Departure***, in paragraphs 67 through 69, pursuant to <u>United States v. Smith</u>, 27 F.3rd 649 (D.C. Cir., 1994), Defendant is eligible for a downward departure as a deportable alien. In <u>Smith</u>, the District of Columbia Circuit Court of Appeals held that "a downward departure may be appropriate where the Defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of the sentence,. . ." *Id.* at 655. Deportable aliens are ineligible, except under very rare circumstances, to serve any of their sentence in a Community Correctional Center or to ever be assigned to a minimum security classification.

Obviously, Ms. Barry's background suggests that she is in fact a minimal security risk, whether able to be classified as such by the Bureau of Prisons or not. It seems grossly disproportionate that she would be required to serve any prison sentence in a facility other than a prison camp and that she would be ineligible for community or

9

home confinement through the Bureau of Prisons. It is respectfully suggested that a departure under <u>United States v. Smith</u>, <u>supra</u>, is appropriate in this case.

    **C.**    **<u>If The Court Does Not Apply U.S.S.G. §2S1.3, A Sentence Within The Guideline Range Set Forth In The Pre-Sentence Investigation Report Would Not Be Reasonable After Consideration Of The Factors To Be Considered In Imposing A Sentence Under 18 U.S.C. §3553.</u>**

As a result of the Supreme Court's ruling in <u>Booker v. United States</u>, 542 U.S. 220 (2005), the United States Sentencing Guidelines are no longer mandatory but are rather one factor to be considered in determining a reasonable sentence in a criminal case. In the Court's Memorandum Order of December 15, 2005, while assigning the burden of proof as to the ***"Safe Harbor"*** upon the Defendant, this Honorable Court also clearly set forth that it would first determine the applicable guideline range and then consider the factors set forth in 18 U.S.C. §3553(a) as they may relate to the sentencing issues in this case[5].

In <u>United States v. Price</u>, 409 F.3d 436 (D.C. Cir., 2005), the Court of Appeals succinctly paraphrased those §3553(a) ***"factors to be considered in imposing a sentence"*** to include, but not be limited to, the following:

    [1]    The nature of the offense;

    [2]    The Defendant's history;

    [3]    The need for the sentence to promote adequate deterrence;

    [4]    [The need] to provide the Defendant with needed educational or vocational training;

---

[5] As for the manner in which the Court may consider the factors of 18 U S C §3553(a), Defendant respectfully incorporates herein by reference her prior arguments and observations concerning the holding of <u>United States v. Coles</u>, 403 F 3rd 764 (D C Cir, 2005) and <u>United States v. Price</u>, 409 F 3rd 436 (D C Cir, 2005)

> [5]     Any pertinent policy statements issued by the Sentencing Commission;
>
> [6]     The need to avoid unwarranted sentencing disparities among similarly situated Defendants;
>
> [7]     The need to provide restitution to any victims.

*Id.* at 442.

An examination of those factors in light of the facts of this case and the circumstances described in Part III(A) of this Memorandum, demonstrate that the guideline range would not result in a reasonable sentence when applied to this Defendant. At the outset, the Court may wish to review the published opinion of The Honorable James C. Cacheris in United States v. Habbal, 2005 U.S. Dist. Lexis 25626 (U.S.D.C., E.D. Va., 2005). In Habbal, the Defendant was convicted of and being sentenced for the same offense that is at issue in the case sub judice. The Court first determined the Guideline Range, next considered downward departures and then analyzed the §3353(a) factors in a manner and to a conclusion which the Defendant hopes the Court will find instructive and persuasive herein.

Defendant respectfully submits that there is nothing in the facts of this case nor in the Defendant's personal background and history which would lead to the just and fair conclusion that a sentence of imprisonment anywhere between 46 and 57 months is reasonable. Defendant will not belabor each factor nor repeat what is already before the Court in the **Pre-Sentence Investigation Report**. A brief mention of the pertinent factors will suffice:

11

1.    **Nature of the Offense** – Judge Cacheris' comments in this regard are particularly apt. Though the <u>Habbal</u> case and this case are by no means factually identical, they are similar in many important respects. Ms. Barry put forth significant effort to legalize her business but lacked the expertise to get it done and failed to seek the necessary professional help. There has been no evidence provided in the Discovery to date of any intent to violate nor aid and abet in the violation of substantive money laundering or terriorism offenses. Ms. Barry has not been shown to have done anything to violate the law other than failing to obtain the necessary Money Transmitter Licenses.

2.    **History and Characteristics of the Defendant** – Ms. Barry's personal history is described in detail at paragraphs 30 through 51 of the **Pre-Sentence Investigation Report**. She has no criminal history. She possesses a Bachelor's degree in African Literature. She is married and recently gave birth to prematurely delivered twins. She continues to reside in Silver Spring, Maryland with her husband, his two children by a previous marriage and their infant twins.

She is one of <u>22</u> siblings. Her family endured significant hardship after a military coup overthrew the Government in Guinea in 1984. She and her family were aligned with and employed by the overthrown Government and thus they were confined to their home after the coup. Much of their material belongings were seized at that time. She entered the United States in 1997 on an I-2 Visa and has been here since that time.

3.    **The Need for the Sentence to Promote Adequate Deterrence** – This

12

factor has been well served by everything which has happened to Ms. Barry as a result of this case already. She has faced financial ruin, feared for her loss of freedom, lost her business and had to face irate customers who were formerly her friends, had to spend time in jail and work with lawyers for a lengthy period of time (perhaps the ultimate deterrent). Defendant has had substantial assets seized and retained by the Government pending the outcome of this case. The deterrence factor for this type of offense has been well served by all that has occurred in this case up to this point and will be more than adequately served by a sentence far shorter than the calculated guideline range.

     4.    **The Need to Avoid Unwarranted Sentencing Disparities Among Similarly Situated Defendants**

Defendant's conduct in this case warrants a Sentence less than or similar to that which Mr. Habbal received. Here again, the analysis of Judge Cacheris in Habbal, supra, may be persuasive to the Court. Judge Cacheris noted that "the predominate federal interest served by §1960 is the regulation of money transmitting businesses to ensure that they do not channel funds from the United States to terrorists, drug traffickers or other criminals abroad." Id at 16. Just as in Habbal, no such evidence has been noted in this case.

Although District of Columbia law provides for a maximum prison sentence of 5 years for operating a money transmitter business without a license pursuant to D.C. Code §26-1023(c), the District of Columbia Voluntary Sentencing Guidelines would suggest a far shorter sentence for this offense for a person with no criminal record such as the Defendant herein. According to those Guidelines, a violation of §26-1023(c)

would be classified as a "Group 9" offense[6] and pursuant to the "Master Grid", a person

such as Defendant convicted in the District of Columbia would more likely receive a

sentence in the range of 1-12 months, with probation "authorized."   The specific

characteristics of this case make a sentence below the guideline range far more

reasonable than the nearly 4 year sentence called for at the low end of offense level 23.

Thus, it is respectfully suggested that any disparity which the Court may note would not

be unwarranted.

### D.    The Forfeitures Requested By The Government Are Excessive And In Violation Of Defendant's 8th Amendment Rights.

The Government is also seeking to forfeit a substantial sum of money which it

deems proceeds of Guinex's business pursuant to the forfeiture provisions of 18 U.S.C.

§1960 and 18 U.S.C. §982.  Defendant has stipulated that the monies seized by the

Government to date, which are listed in the ***Factual Proffer In Support of Guilty Plea***,

represent property "involved in, or traceable to property involved in,....an unlicensed

money transmitting business...."  **See** page 4 of Factual Proffer.  According to counsel's

arithmetic, the total sum which the government seeks to forfeit is $273,727.

The sole issue which the Defendant asks this Honorable court to consider is

whether a forfeiture of this magnitude would be an excessive fine.  In <u>Austin v. Texas,</u>

509 U.S. 602 (1993), the Supreme Court ruled that civil <u>in rem</u> forfeitures of property

were in fact punitive in nature and therefore subject to both the 8th Amendment cruel

---

6 The Offense is not listed as having been classified by the District of Columbia Sentencing Commission
On July 12, 2006, undersigned counsel contacted the Commission, as is suggested by paragraph 1 2 3 of
the Guidelines   Counsel spoke to General Counsel to the Commission, Steven Vance, Esquire  Mr
Vance informed the undersigned that, following the standard procedure of the Commission when there are
inquiries regarding previously unclassified offenses, he would call the Prosecuting and Defense
Commission representatives and if a consensus could be achieved, he would advise and the classification
would be official  He called back a short time later and advised that the offense category "Group 9" would

and unusual punishment clause and the excessive fines clause.  Similarly, in <u>United States v. Bajakajian</u>, the Court had "little trouble concluding…" that forfeitures of currency under 18 U.S.C. §982(a)(1) are also punitive and subject to the excessive fines clause.

The Supreme Court's analysis of the forfeiture at issue in <u>Bajakajian</u> is on-point here as well.  The Court ruled that the forfeiture of Mr. Bajakajian's money was "grossly disproportional to the gravity…" of his offense.  <u>Id</u>. at 334.  In response to the Government's argument that the forfeiture should be granted on an instrumentality theory, the Supreme Court specifically declared that it was "irrelevant whether [Bajakajian's] currency is an instrumentality; the forfeiture is punitive, and the test for the excessiveness of a punitive forfeiture involves solely a proportionality determination."  <u>Id</u>.  Although a number of different factors were considered in reaching this conclusion, the Court relied most heavily upon the legislative determination of the appropriate punishment, in this case the fine structure for the offense set forth in the USSG.  <u>Id.</u> at 338-9.  USSG §5(e)1.2 provides that structure,  establishing a fine range based upon the offense level found to apply in the case then at bar.

In the case <u>sub judice</u>, the applicable offense level is one of the issues to be decided.  However, regardless of whether the court determines that level 23 or level 6 applies, the proposed forfeiture is grossly disproportionate and excessive.  At level 23, the Pre-Sentence Investigation Report correctly sets forth a fine range of $10,000 to $100,000.  At offense level 6, the Guideline range for the fine is $500 to $5,000.  Of course, there are many ranges set forth between these extremes.  This court should

_____

apply.

also note that the maximum fine for this offense under District of Columbia Code Annotated §26-1023(c) is $25,000. Nevertheless, as the Supreme Court has made abundantly clear, the ultimate determination is a comparison of the amount of the forfeiture with the gravity of the offense. *Id.* at 337.

The actual funds which the Government seeks to forfeit come from a number of different accounts, representing a number of different sources, albeit all with some stipulated nexus to the Defendant's business. The court has already heard about the $50,000 surety bond which was posted with the Great American Insurance Company, held as security for its bond. The Suntrust account, item (b) in the Statement of Facts, supra, was Guinex International's main operating account from which most transmissions were made in the last year prior to the closure of the business. The Chevy Chase account described in item (c) in the Statement of Facts was another business operating account. When these funds were seized, a wire transmission of approximately $60,000 was stopped from this account and this money continues to be owed by the Defendant to her correspondent. **See Tab 4** - copies of Wire transfer request and Letter from Correspondent. The Chevy Chase account, described in Item (f) supra,, held personal funds of the Defendant which mostly consisted of the proceeds from the sale of her home at 2749 Sweet Clover Court, Silver Spring in December, 20037. **See Tab 5** – Copy of HUD 1 for sale of property. At that time, Defendant moved into a new home, purchased jointly with her husband at her present address.

---

7 The Government will surely note that in the past, funds were transferred between this account and the Guinex operating account  In essence, Defendant would make personal loans to her business from this account whenever necessary  This form of "co-mingling" does not taint the personal funds of the Defendant and somehow overcome her 8th Amendment rights as the Government has asserted throughout this case.

When considered as a whole, it is clear that the forfeiture of $273,727 of otherwise untainted funds is grossly disproportionate to Defendant's conduct.

## IV    CONCLUSION

For the foregoing reasons, Defendant respectfully submits that she should receive the benefits of the ***"Safe Harbor"*** provisions of USSG §2S1.3. In the alternative, Defendant submits that she should receive a downward sentencing departure pursuant to <u>United States v. Smith</u>, 27 F.3rd 649 (D.C. Cir., 1994) and that a sentence within the guideline range recommended by United States Probation would not be reasonable under <u>Booker v. United States</u>, 542 U.S. 220 (2005) and 18 U.S.C. §3553(a). Finally, the punitive forfeitures sought by the Government are disproportionate to the gravity of Defendant's conduct and would therefore constitute an excessive fine in violation of Defendant's 8th Amendment rights.

Respectfully submitted,

_____
RICHARD A. FINCI,#389841
HOULON, BERMAN, BERGMAN, FINCI
 AND LEVENSTEIN, LLC
7850 Walker Drive, Suite 160
Greenbelt, Maryland 20770
(301) 459-8200
e-mail: finci@houlonberman.com

17

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this _____ day of _____, 2006, I mailed, postage prepaid, a copy of the foregoing Defendant's Sentencing Memorandum to:

Angela G. Schmidt, Esquire
Assistant United State's Attorney
 for the District of Columbia
Judiciary Center
555 Fourth Street, N.W.
Washington, D.C.  20001


RICHARD A. FINCI,#389841