IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v.   : | CR. No. 05-0210 (RMU) |
| : | |
| AISSATOU PITA BARRY,   : | |
| : | |
| Defendant.   : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits the following sentencing recommendation and reasons in support of such recommendation.

BACKGROUND

1.  On September 12, 2005, Aissatou Pita Barry (hereafter "defendant") pleaded guilty to one count of operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960, and a related criminal forfeiture allegation.  In connection with her plea, defendant admitted that she incorporated and operated Guinex International, Inc., (hereinafter "Guinex") in the District of Columbia as a money transmitting business, and that she failed to obtain a license to operate her business, as required by D.C. law, or to register her business with the Department of Treasury, as required by federal law.  Between October 26, 2001, and November 15, 2004, Guinex conducted over 65,000 transactions on behalf of approximately 5000 customers.  During this time period, Guinex received deposits from its customers totaling over $17,000,000 and in turn transferred over $15,500,000, via wires to various international locations for further distribution to individuals who

had been designated by Guinex's customers in the United States. Guinex generally charged a fee for its services of 10% of the total amount of money transferred. Defendant and other Guinex employees accepted cash and other deposits from customers at Guinex's office. Defendant and other Guinex employees also provided customers with the numbers of various bank accounts controlled by defendant and instructed customers that they could make deposits directly into those accounts. Defendant stated that most, though not all, of her customers are people she sees in the community. Defendant also stated that she obtained phone numbers and addresses from her customers, but she did not ask them to provide any form of identification. Defendant and other Guinex employees did not ask customers to provide any information about the source of the monies they were transmitting. Defendant was not familiar with the various forms used to report currency transactions or suspicious activity.

2.    The United States Sentencing Guideline applicable to Operating an Unlicensed Money Transmitting Business is §2S1.3. Under that guideline, defendant's base offense level is 6. *See* §2S1.3(a)(2). Twenty levels are added because the value of the funds defendant transmitted during the operative time period was between $7,000,000 and $20,000,000. *See* §§2S1.3(a)(2); 2B1.1(b)(1)(K). Section 2S1.3(b) sets out three specific offense characteristics that provide for increases and a decrease to the defendant's base offense level if certain conditions are met. In this case, the parties contest whether the defendant is eligible for a decrease in her offense level from a level 26 to a level 6 under §2S1.3(b)(3). That Section provides for such a decrease if four conditions are met: (1) subsection (a)(2) applies and subsections (b)(1) and (b)(2) do not apply; (2) the defendant did not act with reckless disregard of the source of the funds; (3) the funds were the proceeds of lawful activity; and (4) the funds were to be used for a lawful purpose. The government

does not expect to argue at sentencing that the increases set forth in subsections (b)(1) and (b)(2) apply to the defendant. The government does contest, however, whether the remaining three conditions of §2S1.3(b)(3) have been met.

      3.      By Memorandum Order dated December 15, 2005, this Court ruled that the defendant bears the burden of proof to establish her eligibility for a sentencing reduction under § 2S1.3(b)(3).

APPLICABLE REGULATIONS

      4.      The Bank Secrecy Act of 1970 (BSA) and numerous subsequent acts, including the Money Laundering Control Amendments of 1988, the Money Laundering Enforcement Amendments of 1991 and the Financial Anti-Terrorism Act of 2001, reflect Congress's long-standing effort to combat money laundering by creating record keeping and reporting requirements for financial institutions and thus strengthening the ability of law enforcement authorities to disrupt drug trafficking, terrorism and numerous other illegal activities funded by these laundered monies. The Financial Crimes Enforcement Network (FinCEN), a component of the U.S. Department of Treasury, is vested with the authority to implement and administer regulations to achieve the objectives of the statute and its amendments. Pursuant to that authority, FinCEN has issued numerous reporting and record keeping requirements for financial institutions, including money service businesses (MSB's). The purpose of these requirements is to create paper trails of transactions that law enforcement and others can use in their investigations to combat money laundering and other offenses.

5.  The following regulations are of import in this case:[1]

   a.  **Anti-Money Laundering Compliance Program**. Under 31 C.F.R. § 103.125, MSBs are required to develop and implement an Anti-Money Laundering (AML) compliance program. Each AML compliance program must be in writing and must:

   i.  incorporate policies, procedures and internal controls reasonably designed to assure compliance with the BSA;

   ii.  designate a compliance officer responsible for day-to-day compliance with the BSA and the compliance program;

   iii.  provide education and/or training of appropriate personnel;

   iv.  provide for independent review to monitor and maintain an adequate program.

   Each program must be commensurate with the risks posed by the location, size, nature and volume of the financial services provided by the MSB.

   b.  **Suspicious Activity Reports (SARs)**. Under 31 C.F.R. § 103.20(a), MSBs are required to file suspicious activity reports (SARs) when appropriate and maintain a copy of all such reports and supporting documentation for five years from the date of the report. All MSBs should have a system or procedure in place to ensure that SARs are filed when appropriate. A SAR must be filed by an MSB when a transaction is both suspicious and $2000 or more. A transaction is suspicious if it:

---

[1] The requirements set forth in this section are condensed or taken verbatim from "Money Laundering Prevention: A Money Services Business Guide," a pamphlet published by the Financial Crimes Enforcement Network of the U.S. Department of Treasury and available on its web site at www.msb.gov.

i. involves funds derived from illegal activity, or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity;

ii. if it is designed to evade BSA requirements, whether through structuring or other means;

iii. if it appears to serve no business or apparent lawful purpose, and the MSB can determine no reasonable explanation for the transaction after examining all available facts;

iv. if it involves use of the MSB to facilitate criminal activity.

Red flags include:

i. a customer's use of a false, altered or expired identification;

ii. a customer who is unable or unwilling to provide identification;

iii. a customer who changes a transaction upon learning that s/he must show identification;

iv. a customer who changes the spelling or order of his/her full name;

v. two or more customers working together to break one transaction into two or more transactions in order to evade the BSA reporting or record keeping requirements;

vi. a customer who uses two or more locations in the same day, or who conducts several similar transactions over several days, in order to break one transaction into smaller transactions and evade the BSA reporting or record keeping requirements;

vii. a customer who conducts transactions in large amounts inconsistent with the income generated by the customer's stated occupation or business;

viii. a business customer who conducts overseas transactions without an apparent business reason;

ix. a customer who does not reside or work in the MSBs service area;

x. sudden and inconsistent changes in the nature, size, and/or frequency of a customer's transactions;

    xi.    a customer who offers bribes or tips;

    xii.    a customer who admits to criminal conduct.

An MSB that correctly verifies and documents a customer's identity is more likely to recognize suspicious activity that should be reported.

c. **Currency Transaction Reports (CTRs)**. Under 31 C.F.R. § 103.22, MSBs must file currency transaction reports (CTRs) on transactions in currency involving more than $10,000.

d. **Funds Transfer Rules**. Under 31 C.F.R. § 103.33(f), MSBs must verify the identity of the send customer and create and maintain a record of any money transfers of $3000 or more, regardless of the method of payment.

e. **Agent list**. Under 31 C.F.R. § 103.41, MSBs that are required to register must prepare and maintain a list of their agents, if any, each year for the preceding 12-month period and make that list available upon request to any appropriate law enforcement or supervisory agencies. The list should include:

    i.    the name and address of the agent;

    ii.    the type of services the agent provides;

    iii.    the year in which the agent first became an agent of the MSB;

    iv.    a listing of each month in the preceding year in which the agent's gross transaction amount exceeded $100,000;

    v.    the name and address of any depository institution at which the agent maintains a transaction account for any of the funds received in or for the MSB.

ANALYSIS OF DEFENDANT'S BUSINESS PRACTICES

5.	As noted, between October 26, 2001, and November 15, 2004, Guinex conducted over 65,000 transfers totaling over $15,500,000 on behalf of approximately 5000 customers.[2] To its credit, Guinex maintained a computerized database reflecting these transactions and some information about its customers; however, a review of that database and interviews with the defendant and former Guinex employees make clear that Guinex maintained records solely for its own business purposes and without any view toward complying with anti-money laundering regulations.

6.	**Customer characteristics**. Guinex maintained a customer database in which each customer is identified by a unique numerical or alphabetic code. The customer database also contains fields for the following identifiers: first name, last name, social security number, address, city, state, zip, work phone, and home phone. A social security number is not listed for any of Guinex's 5000 customers. Moreover, the customer database reflects a startling lack of identifying information for approximately 1780 (35%) of Guinex's 5000 customers. Specifically, Guinex's customer database contains a name only (sometimes only a first name), and no address or phone number, for 1165 customers who conducted approximately $1.96 million in transactions (exclusive of fees) in the three years between late October 2001 and November 2004. For another 617 such customers, the database contains a name and phone number only, and no address. These customers conducted approximately $1.2 million in transactions (exclusive of fees) during the relevant time period. Combined, these customers accounted for almost half of Guinex's customers and approximately 21% of its business during the relevant time period. The startling lack of information about these customers reflects defendant's admitted practice of not requesting proof of identification

---

[2]	These transactions generated approximately $1.5 million in fees for Guinex.

from any of her customers

6.    Moreover, of the customers for whom the database contains addresses, the majority who conducted transactions during the relevant time period provided addresses outside the District of Columbia, Maryland, and Virginia. Guinex's customer database lists over 1300 customers (26% of Guinex's total customers) in 34 states. About 1050 of those customers conducted approximately $4,660,000 in transactions (exclusive of fees) during the relevant time period. These out-of-area customers thus accounted for 32% of Guinex's business. A list of the number of active out-of-area customers and amount of their combined transactions for states with transactions totaling over $100,000 is as follows:

| State | Number of Active Customers | Aggregate Amount of Transactions |
|---|---|---|
| California | 168 | $943,793 |
| Florida | 75 | $244,420 |
| Georgia | 136 | $420,638 |
| Indiana | 27 | $116,170 |
| Minnesota | 40 | $114,690 |
| Missouri | 25 | $112,870 |
| New Jersey | 47 | $131,637 |
| New York | 32 | $110,231 |
| North Carolina | 59 | $182,826 |
| Ohio | 94 | $428,210 |
| Oklahoma | 6 | $122,240 |
| Pennsylvania | 30 | $165,233 |
| South Carolina | 15 | $204,445 |
| Tennessee | 36 | $172,205 |
| Texas | 116 | $645,545 |

7.    Guinex was able to conduct transactions with out-of-area customers because its employees provided Guinex's bank account numbers over the telephone to its customers. The customers, in turn, deposited funds directly into Guinex's accounts and provided notice and

sometimes a receipt of these deposits to Guinex.[3]  According to a long-time Guinex employee, Guinex continued this practice even after bank officials warned Guinex that they were not permitted to do so and later closed Guinex's accounts at the bank.

8.      In a November 2004 interview, the defendant claimed that most of her customers are from the same community and "we see each other."  Clearly, however, her business records and her business practices belie this claim.  The customers for whom Guinex maintained only the barest of identifying information and its out-of-area customers combine for a total of 57% of its active customers and 50% of its business in the three years between late October 2001 and November 2004.  Moreover, the defendant admittedly made no effort to verify the identity of the customers with whom Guinex conducted business in person.

9.      Interviews in November 2004 with the defendant's two employees further belie the defendant's claim that she knows most of her customers.  When asked what controls or methods were used to identify customers, a long-time employee stated, "Just names and telephone numbers in a database from information customers provide us.  Whatever they say we put down."  When asked what controls are in place to ensure that the money Guinex wires is not used for illegal activities, the employee stated, "There is no way for us to know.  Because we do not know these people personally.  Some are just telephone calls."  Finally, when asked what efforts are made to "know your customers," the employee answered, "Most of our customers like 90% have never been through school, so I just figure they say who they are.  They can sometimes not even spell their

---

[3]     Certainly an argument can be made that by allowing out-of-area customers to deposit monies directly into Guinex's bank accounts, Guinex was conducting business with those customers in the states where they resided and thus Guinex should have obtained a license to operate a money service business in each of the states that had such a licensing requirement.

name." Defendant's other employee also confirmed that "[w]e do not check identification," that there was "no way to know" whether the money Guinex wires is used for illegal activities, and that no efforts were made to know the customers "other than telephone number."

10.     **Wire Transfer Destinations.**     According to Guinex's business records, the overwhelming majority of transfers conducted by Guinex on behalf of its customers were sent to recipients located in Guinea, Sierra Leone, Gambia and Senegal. However, none of the wire transfers sent by Guinex in the course of its business operations was sent to banks located in those countries. Instead, the wires were directed to accounts in China, France, Hong Kong, India, Morocco, Northern Ireland, Turkey, Singapore, South Africa and the United Arab Emirates. The further instructions were for the benefit of a host of companies and individuals, including, for example:

> ETS Wapha Shoes, Casablanca, Morocco
> Fayrefield Foods Ireland, Ltd., Belfast, Northern Ireland
> Vergnet S.A. at Bro Bank, Orleans France
> Tri Star Electronics PTE Ltd., Singapore, contact person Bah M A
> Amsua Trading Co., Ltd., Hong Kong
> May (India) Laboratories Pvt Ltd., Chennai, India
> Davita Trading Pty Ltd., Johannesburg, South Africa
> China Artex Taizhou Import & Exp Co., Zhenjiang, China
> Int'l Cargo & Clearing Co., Dubai, UAE
> Bifa Biscuits, Konya, Turkey

These wire instructions raise a host of questions about who these companies and individuals are, what their connection is to the defendant and her business, and why such circuitous routings were used to send money to recipients in the countries Guinex served.

11.     **No Anti-Money Laundering Program**.     Guinex did not have an anti-money laundering program, either in writing as required by regulation or in application. No policies or practices were in place for identifying suspicious customers or transactions, and employees received

no training on how to do so. Indeed, Guinex turned a blind eye toward the risks that its customers could be using its "no questions asked" practices as a conduit to launder proceeds of illegal activity. The risks posed by Guinex's business practices were considerable, particularly given the volume and nationwide scope of its business, thus magnifying the potential harm caused by its complete failure to implement any anti-money laundering measures.

12.     **Suspicious Activity**.  By her own admission, the defendant did not know about the requirements for filing SARs, and consequently she failed to file any such reports. The defendant conducted over 750 transactions of $2000 or more totaling approximately $2.6 million (exclusive of fees) during the relevant time period. An examination of her business records reflects numerous red flags in those transactions. For example:

> **Customer 2068**: This customer, Guinex's largest, conducted over $250,000 in transactions with Guinex, and paid approximately $25,000 in fees, between November 2001 and November 2004. Each transaction was in the amount of $10,000 or more. Guinex's customer database contains only two telephone numbers and no address for this customer. According to Guinex's records, deposits were made by the customer directly into Guinex's bank accounts. The customer also is the recipient of the transferred funds. **Red flags:** a customer who is unable to unwilling to provide identification; no known business or apparent lawful purpose for this large volume of transactions.
>
> **Customer CHNO**: This Virginia-based customer conducted about $74,000 in transactions with Guinex, and paid over $6700 in fees, between late October 2001 and November 2004. According to Guinex's records, most deposits were made by the customer directly into Guinex's bank accounts. For several years, most deposits were in the hundreds, with a few deposits over $1000, the largest of which was $4000. In February 2004, this customer conducted a transaction for $10,000. **Red flag:** sudden and inconsistent changes in the nature, size and/or frequency of a customer's transactions.
>
> **Customer LAIK**: This Texas-based customer conducted almost $97,000 in transactions with Guinex, and paid over $9600 in fees, between November 2001 and November 2004. According to Guinex's records, most deposits were made by the customer directly into Guinex's bank accounts, although a number also were made by money order. The customer's total monthly transactions increased significantly

in September 2002 from a previous high of $2000 to $4850. The customer's total monthly transactions reached as high as $17,350 in November 2002 and remained unusually high until September 2003. The customer conducted three transactions to the same recipient on November 6, 12 and 19, 2002, totaling $16,300. **Red flags:** no known business or apparent lawful purpose for this large volume of transactions; a customer who does not reside or work in the MSB's service area; sudden and inconsistent changes in the nature, size and/or frequency of a customer's transactions; a customer who conducts several similar transactions over several days in order to break one transaction into smaller transactions and evade the BSA reporting or recordkeeping requirements.

**Customer SAFI**: This California-based customer conducted approximately $180,000 in transactions with Guinex, and paid about $18,000 in fees, between late October 2001 and November 2004. According to Guinex's records, most transactions were paid by credit, although a number also were made by check or by deposit directly into Guinex's bank accounts. The customer's total monthly transactions increased significantly in August 2002 from a previous high of $4000 to $6750. Between September 2002 and October 2003, monthly totals usually were well over $7000 and ran as high as $14,200. Most of the larger transactions went to the same recipient. **Red flags:** no known business or apparent lawful purpose for this large volume of transactions; a customer who does not reside or work in the MSB's service area; sudden and inconsistent changes in the nature, size and/or frequency of a customer's transactions.

13.     **Failure to File a CTR**.  By her own admission, the defendant also did not know about the requirements for filing a CTR, nor did either of her employees. Guinex's records include a field for cash transactions. Those records reflect that defendant conducted approximately 12,900 transactions in cash totaling almost $3 million.[4] Of those transactions, a transaction conducted on September 9, 2004, in the amount of $10,000 plus an $800 fee appears to have violated the CTR requirement.

---

[4] During the relevant time period, banks filed over 100 CTRs documenting cash deposits into Guinex's accounts ranging from $7920 to $221,224 and totaling approximately $3.2 million.

14.    **Funds Transfer Rules**.  Guinex conducted over 300 transactions of $3000 or more totaling approximately $1.6 million (exclusive of fees).  As already noted, Guinex did not verify the identity of any of these customers, as required by regulation.

15.    **Failure to Maintain an Agent List**.  Although Guinex's database contains a directory for agents, the information in that directory is incomplete and outdated.  Guinex's transaction database, which contains a field identifying over ten agents by numerical code or name, reflects that most agents who conducted transactions on behalf of Guinex during the three years between late October 2001 and November 2004 are not listed in the database's agent directory.  To the extent that any information about the agents can be gleaned from Guinex's database, it appears that Guinex did business with agents located in London (Hady, Jeanne and Djenabou), New York (Bailo) and Ohio (Diop).  Clearly, much of the information that Guinex was required to maintain about its agents is not readily accessible from a review of its database.

16.    The foregoing analysis of Guinex's records and business practices makes clear that the defendant quite simply did nothing to comply with the requirements of the Bank Secrecy Act and its progeny: she did not maintain an anti-money laundering program, file CTRs or SARs when appropriate, verify the identity of customers conducting transactions over $3000, or maintain an agent list, all of which  money services businesses are required to do by regulation.  Moreover, she and her employees did not ask customers any questions about the source of the funds or the purpose for which the funds were being transferred.  Indeed, the defendant's practice of accepting business from out-of-area customers and allowing customers to deposit funds directly into Guinex's bank accounts deprived Guinex of any meaningful opportunity to ask such questions or to verify a customer's identity.  Clearly, in light of the defendant's business practices, she can not meet her

burden of establishing that she did not act with reckless disregard of the source of the millions of dollars in funds she transmitted on behalf of her customers, that the funds were the proceeds of lawful activity, and that the funds were to be used for a lawful purpose. *See United States v. Abdi*, 342 F.3d 313, 316-7 (4th Cir. 2003), *cert. denied*, 540 U.S. 1167 (2004) (Upholding district court's finding that the defendant's had not met their burden of satisfying conditions for the safe harbor provision, even though they testified that they knew many of their customers and kept records of transactions, since they did not know the sources of the money transmitted nor the uses for the money once it reached its destination overseas.) Indeed, the defendant's "no questions asked" business practices epitomize such reckless disregard.

## SENTENCING RECOMMENDATION

17.     The Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), ruled that the Sentencing Guidelines are advisory rather than mandatory. However, the Court made clear that in determining the appropriate sentence for a defendant, federal courts still are required to calculate and consider the applicable Guidelines range, refer to the pertinent Sentencing Commission policy statements, and bear in mind the need to avoid unwarranted sentencing disparities and to provide restitution to victims. *Id.* at 259-60. Moreover, in determining an appropriate sentence for the defendant, federal courts also must continue to consider the need for the sentence imposed to accomplish the following sentencing objectives: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. *Id.* at 260; *see also* 18 U.S.C. § 3553(a)(2).

18.     Arguably, the applicable Sentencing Guidelines range is the most important factor the Court can consider in sentencing the defendant in this case because this range is calculated based upon the Sentencing Commission's careful consideration of all of the factors the Supreme Court and Congress have directed courts to consider in sentencing defendants.  The applicable Guidelines range in this case reflects an intensive objective analysis of sentences imposed on defendants similarly situated to defendant and is a critical tool to avoid unwarranted sentencing disparities.  According to the presentence report, the defendant has an adjusted offense level of 23 and a criminal history category of I, resulting in a Guidelines range of 46 to 57 months.[5]

19.     Turning specifically to the § 3553 factors, the defendant's conduct in failing to obtain a state license for her money transmitting business and to register it with the Department of Treasury warrants incarceration.  The defendant's offense was borne of willfulness, not ignorance.  By the defendant's own admission, and as verified by one of her employees, the defendant relocated her business from Maryland to the District of Columbia when she learned that Maryland had a licensing requirement.  When the District of Columbia enacted such a requirement in 2000, she continued to operate her business for years without a license, including while her application was pending and not yet approved.  She claims she did so because no one told her that she could not operate without a license, but also admits that no one told her she could operate without one.  This willful blindness toward her licensing and registration obligations should not be minimized or tolerated.

---

[5]     The adjusted offense level credits the defendant with a three-point adjustment for acceptance of responsibility pursuant to §3E1.1(b) of the Sentencing Guidelines.  The government agrees that this adjustment is appropriate since the defendant, through her counsel, timely notified the government of her intention to plead guilty, and thereby permitted the government to avoid preparing for trial and also permitted the government and the Court to allocate their resources efficiently.

20.     Incarceration also is necessary in this case to hold the defendant accountable for the risks posed, and potential harm caused, by her "no questions asked" business practices and her complete failure to comply with the numerous reporting and record keeping requirements imposed on money transmitting businesses. Congress repeatedly has warned of the dangers associated with unfettered financial transactions and has espoused the value of imposing detailed record keeping requirements on financial institutions in order to deter money laundering and provide a paper trail for law enforcement authorities to recognize and combat it. Of course, the effectiveness of such measures depends in large part on the compliance efforts of the businesses to whom they are addressed. Moreover, the consequences for businesses who do not comply should increase proportionately to the potential harm caused by the offense, as reflected by the location, size, nature and volume of the business conducted in violation of the regulations. The defendant engaged in extremely risky business practices by conducting millions of dollars in transactions on behalf of customers whose identities she never attempted to verify. Incarceration is necessary and appropriate to account for the full extent of her shortcomings. Incarceration of the defendant also will send a clear message to others that serious consequences will flow from similar behavior.

21.     Finally, incarceration provides just punishment for the defendant, who not only operated an unlicensed and unregistered money transmitting business for many years, but did so in direct violation of the terms of her non-immigrant visa. The defendant, a citizen of Guinea, has lived in the United States since the late-1990's pursuant to an A-2 visa, first to work on the staff of the Embassy of Gabon and then to work on the staff of the Embassy of Guinea. However, the defendant

has not worked at the Embassy of Guinea since at least July 2002.[6] Moreover, A-2 visa holders specifically are prohibited from engaging in outside employment. *See* 8 C.F.R. §§ 214.1(e), 274a.12(b)(1). The defendant's operation of a money transmitting business thus was a flagrant failure to comply with the terms of her visa and, like the manner in which she operated that business, reflects her recalcitrance and contempt toward this nation's laws. The government thus requests that the Court impose a sentence of 46 months imprisonment in this case, which sentence not only is consistent with the Sentencing Guidelines and Congress's goal in implementing them of ensuring uniformity in sentencing, but also is entirely reasonable, appropriate and necessary to satisfy Congress's other stated sentencing objectives.

WHEREFORE, the United States respectfully requests that the Court impose a sentence of 46 months imprisonment in this case and order the forfeiture of all monies seized from the defendant and her business accounts.

                                                          Respectfully submitted,

                                                          KENNETH L. WAINSTEIN
                                                          United States Attorney
                                                          D.C. Bar No. 451058

By: _____
       ANGELA G. SCHMIDT
       Assistant United States Attorney
       Texas Bar No. 17764980
       Federal Major Crimes Section
       555 4th Street, N.W., 4th Floor
       Washington, D.C. 20530
       (202) 514-7273
       Angela. Schmidt@usdoj.gov

---

[6] In a letter dated June 3, 2005, the Embassy of the Republic of Guinea indicated that despite being registered with the Department of State as a staff member of the Embassy, Ms. Barry was not working at the Embassy and had not done so since at least July 2002, when the current Ambassador took charge.